**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

CHRISTOPHER K. EWING, INDIVIDUALLY and ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiff,

v.

VERU INC., MITCHELL STEINER, and MICHELE GRECO,

Defendants.

Case No. 1:22-cv-23960-KMW-LMR

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURTIES LAWS**

JURY TRIAL DEMANDED

Dated: September 15, 2023

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins
Gregory M. Potrepka
Rachel A. Berger
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
rberger@zlk.com

*Lead Counsel for Plaintiffs and the Class*

**CULLIN O'BRIEN LAW, P.A.**
Cullin O'Brien
Florida Bar No. 0597341
6541 NE 21st Way
Fort Lauderdale, Florida 33308
Telephone: (561) 676-6370
Facsimile: (561) 320-0285
Email: cullin@cullinobrienlaw.com

*Liaison Counsel for Plaintiffs and the Class*

**TABLE OF CONTENTS**


SUMMARY OF THE ACTION .......... 2

JURISDICTION AND VENUE .......... 5

PARTIES .......... 5

I. Plaintiffs .......... 5

II. Defendants .......... 6

III. Relevant Non-Party .......... 8

STATEMENT OF FACTS .......... 8

I. Veru Is Born Out of a 2016 Merger Intended to Pivot from Profitable but Low-Growth Sexual Health Products, to Pre-Revenue, but High-Growth Pharmaceutical Products .......... 8

II. Following the APP Merger, Veru's R&D Pipeline Included the Drug Candidate Sabizabulin, Internally Named "Veru-111," in Development as a Treatment for Prostate Cancer .......... 10

III. Veru Experiences a Short-Lived Earnings Boost from COVID-Related Telemedicine Which Results in Higher FC2 Sales That Were Unsustainable and Sharply Declined During the Class Period .......... 11

IV. Prior to and Throughout the Class Period, Veru's R&D Costs Skyrocket .......... 16

V. To Reverse Veru's Disastrous Profitability Resulting from Lower FC2 Revenue and Higher R&D Costs, Defendants Opportunistically Develop Sabizabulin for the Treatment of COVID-19 in Pursuit of an Emergency Use Authorization from the FDA, a Potential Source of Astronomic Revenue .......... 18

A. Defendants Identify a Possible Application of Veru-111 for COVID-Induced ARDS . 19

B. The Federal Government's Urgency, Desire, and Willingness to Issue EUAs in Response to the Pandemic Creates an Opportunity to Develop and Sell Sabizabulin on an Expedited and Less Expensive Basis .......... 20

VI. Prior to the Class Period, Veru Conducts a Phase II Trial for Sabizabulin .......... 23

VII. Strapped for Cash, Defendants Design and Execute an Undersized and Unreliable Phase III Trial, Despite Numerous Warnings from the FDA that the Trial Size Was Too Small and That a Two-to-One Randomization Ratio Was Insufficient .......... 24

A. Over the FDA's Objections, Defendants Repeatedly Reduce Phase III Trial Size to Conserve Cash .......... 24

B. As a Result of Defendants' Trial Size Reductions, The Phase III Trial's Results Were Anomalous and Unreliable .......... 28

VIII. Prior To, and Throughout the Class Period, Defendants Concealed from Investors That the FDA Repeatedly Requested a Larger Trial and a One-To-One Study Design in Order to Grant an EUA .......... 31

DEFENDANTS' MATERIAL CLASS PERIOD MISREPRESENTATIONS AND OMISSIONS .......... 35

I. March 1, 2021 Press Release ... 36
II. May 12, 2021 Earnings Call ... 37
III. May 11, 2022 Press Release ... 38
IV. May 12, 2022 Press Release ... 40
V. May 12, 2022 Form 10-Q ... 41
VI. May 12, 2022 Earnings Call ... 43
VII. August 11, 2022 Form 10-Q ... 45

THE TRUTH IS REVEALED IN TWO SETS OF PARTIALLY CORRECTIVE DISCLOSURES AND/OR MATERIALIZATIONS OF THE RISK ... 47
I. The November 9, 2022 PADAC Meeting ... 47
II. The March 2, 2023 Press Release ... 48

ADDITIONAL SCIENTER ALLEGATIONS ... 49
I. The Individual Defendants Knowingly and/or Recklessly Made Material Misstatements and/or Omitted Material Facts. ... 49
A. The FDA "Repeatedly" Told Defendants That the Phase III Trial Was Too Small and Continually Raised Concerns About Study Design and Lack of Sufficient Safety Data ... 49
B. Defendants Admit to and Tout "Constant Dialogue" with the FDA Regarding the Phase III Trial Throughout the Class Period ... 50
C. That Defendants Increased the Proposed Trial Size from 200 to 400 Following Their Initial Meeting with the FDA Evidences That Defendants Knew the FDA Wanted a Larger Trial and Believed That a Trial with 200 Participants Was Too Small to Obtain EUA Approval ... 53
D. Defendants Admit They Made a "Business Decision" When Reducing the Phase III Trial Size ... 53
II. The Individual Defendants Were Motivated to Commit Fraud ... 54

LOSS CAUSATION ... 56
CLASS ACTION ALLEGATIONS ... 59
PRESUMPTION OF RELIANCE ... 61
NO STATUTORY SAFE HARBOR ... 63
CLAIMS FOR RELIEF ... 64
COUNT I ... 64
COUNT II ... 67
PRAYER FOR RELIEF ... 68
JURY DEMAND ... 69

1. Lead Plaintiff Myo Thant, M.D. ("Dr. Thant" or "Lead Plaintiff") and Plaintiff Karen Brounstein (collectively with Dr. Thant, "Plaintiffs") bring this action pursuant to 15 U.S.C. §§ 78j(b) and 78t(a) ("Section 10(b)" and "Section 20(a)," respectively) of the Securities Exchange Act of 1934 (the "Exchange Act") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), on behalf of themselves and all persons and entities other than Defendants (defined below) who purchased or otherwise acquired securities of Veru Inc. ("Veru" or the "Company") between March 1, 2021 and March 2, 2023, inclusive (the "Class Period").

2. Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of their undersigned attorneys ("Lead Counsel"), which included, among other things: (i) review and analysis of Veru's public filings with the SEC; (ii) review and analysis of Veru's other public statements, including press releases, conference call transcripts, and interviews with various news sources; (iv) review and analysis of reports of securities and financial analysts, news articles, and other commentary and analysis concerning Veru and the industry in which it operates; (v) review of documents released by the U.S. Food and Drug Administration ("FDA") in connection with its consideration of Veru's Emergency Use Authorization application for sabizabulin; and (vi) review of pertinent court filings. Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, Defendants. Plaintiffs believe substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

3. This is a straightforward securities fraud case. Veru and its executive officers made a series of knowingly false and misleading public statements concerning their private communications with the FDA regarding an Emergency Use Authorization ("EUA") from the FDA for Veru's drug candidate, sabizabulin (or "Veru-111"). Specifically, throughout the Class Period, Defendants misrepresented discussions they had with the FDA regarding a "phase 3" clinical trial of sabizabulin (the "Phase III Trial" or "Study 902"). Veru submitted the results of the Phase III Trial to the FDA as its basis for requesting EUA approval. Defendants' false statements gave investors a material misimpression regarding the FDA's views of the Phase III Trial's design and execution, and consequently, Veru's chances of securing an EUA for Veru-111.

4. Historically, Veru's only business was manufacturing and selling internal condoms, which limited growth potential for the Company. However, in 2016, Veru merged with a research and development ("R&D") firm that owned a pipeline of five research-stage drug candidates. After the merger, Veru's business model focused on diverting revenue from its condom product called "FC2" toward its efforts to commercialize pharmaceutical products. Throughout the Class Period, Veru's pharmaceutical candidates were all pre-revenue and in various stages of costly clinical trials, and sales from the Company's legacy FC2 business were greatly deteriorating.

5. Following the onset of the COVID-19 pandemic, Defendants "opportunistically" undertook development of sabizabulin—which Veru was then researching for a cancer indication—for the treatment of COVID-related symptoms. Veru hoped to obtain an EUA from the FDA, which would allow the drug to be monetized on a shorter timeline than an ordinary-course New Drug Application ("NDA"), which requires greater evidentiary support and is evaluated on a stricter regulatory standard. Defendants knew that an EUA could be a critical

revenue stream for Veru, especially at a time the Company was incurring substantial costs from other clinical trials and as FC2 sales withered during the Class Period.

6. In May 2021, in support of its quest for an EUA, Veru initiated a Phase III Trial of 300 participants who would be randomly distributed on a two-to-one (2:1) basis between treatment and placebo arms. Veru's Phase III Trial was materially smaller than any other trial submitted to the FDA in support of an EUA for a COVID-19 treatment. Nonetheless, Defendants represented that the FDA had "collaborat[ed]" with the Company to develop the trial design and approved of its parameters, including its size, stating, for example, that "***The FDA agreed*** upon sabizabulin for the COVID-19 Phase 3 trial as a double-blind, multi-center, multinational ***randomized 2:1 placebo-controlled trial … in 300 hospitalized COVID-19 patients***."

7. In March 2022, as Veru's cash position continued to worsen from declining FC2 revenues and increasing R&D costs, Defendants made the "business decision" to reduce the trial size to a total of 210 subjects; and, in April, terminated enrollment early following an interim analysis of 150 subjects. After meeting with the FDA in May 2022 to discuss the trial results, Defendants unqualifiedly touted to investors that "***FDA agreed that no additional safety data [was] required to support an EUA***" and further agreed that "***[n]o additional efficacy or safety studies [would] be required***." Defendants reiterated that the FDA had "***helped develop the study design***" and had given the "***green light***" and "***encouragement***" to proceed with an EUA application based upon the data from the Phase III Trial. Indeed, addressing risks posited by short sellers, Defendant Steiner flatly stated "Concern #4, there is a high risk that the FDA will not accept an EUA application because our Phase III study was too small. ***Not true.***"

8. Defendants, who were admittedly in "constant dialogue" with the FDA, knew none of these statements were true. Months later, the FDA categorically refuted them during a

November 9, 2022 advisory committee meeting convened to assess Defendants' EUA request. During this meeting FDA representatives disclosed that "communications between the division and the sponsor ***highlighted repeatedly*** that the size of the safety database was small," the FDA had "ma[de] clear to the sponsor, a few times, [it] would expect ***500 subjects***" in the treatment group alone, the FDA "also cautioned against the 2 to 1 randomization ratio[,]" and the FDA had "continu[ally] caution[ed]" against the change from 300 to 210 subjects. Defendants knowingly and consciously concealed all of these warnings from investors and materially misrepresented that the FDA "agreed" with the Phase III Trial's design and execution. Further, Defendants attended the advisory committee meeting and did not dispute the FDA's disclosures. In fact, Defendants have never disputed the FDA's representations to date.

9. In response to the FDA's comments at the November 9, 2022 meeting, the advisory committee voted against issuing an EUA, with every single "No" vote remarking that the sample size of the Phase III Trial was too small, that they would have required a larger trial, and/or that the FDA's "repeated" requests for a 500-person treatment population influenced their decision. Accordingly, on November 10, 2022, Veru's common stock price dropped $8.04 per share, or almost ***54%***, on high trading volume.

10. On March 2, 2023, the risk of an EUA denial fully materialized when Veru announced that the FDA formally declined its EUA request. This news caused Veru's common stock to fall $1.36 per share, or approximately ***40%***, on March 3, 2022, on high trading volume.

11. At all times throughout the Class Period, Defendants' false and misleading statements caused Veru's stock price to be artificially inflated or artificially maintained. Therefore, Plaintiffs and other members of the Class suffered considerable losses as a result of purchasing Veru securities at artificially inflated prices. Plaintiffs now seek damages to recover such losses.

## JURISDICTION AND VENUE

12. The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, codified at 15 U.S.C. §78aa ("Section 27"). In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications, and the facilities of national securities exchanges. Veru trades in an efficient market on the NASDAQ.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Exchange Act Section 27 because many of the false and misleading statements were disseminated in or from this District. Veru's headquarters is located in this District at 2916 N. Miami Avenue, Suite 100, Miami, Florida.

## PARTIES

### I. Plaintiffs

15. On July 27, 2023, Dr. Myo Thant, was appointed Lead Plaintiff by the Court pursuant to Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(3). Lead Plaintiff, as set forth in his amended certification filed concurrently herewith, purchased Veru securities at artificially inflated prices during the Class Period and was damaged as a result of the fraud alleged herein.

16. Additional Plaintiff Karen Brounstein, as set forth in her certification filed currently herewith, purchased or otherwise acquired Veru securities at artificially inflated prices during the Class Period and was damaged thereby.

**II. Defendants**

17. Defendant Veru Inc. ("Veru" or the "Company") is a Wisconsin corporation with its principal place of business in Miami, Florida. Veru is a composite of wholly owned subsidiaries that merged in 2016, with two primary arms: The Female Health Company ("FHC"), which manufactures and sells internal condoms and other sexual health products, and Aspen Park Pharmaceuticals, Inc. ("APP"), a biopharmaceutical company focused on oncology, urology, and, more recently, virology. The Company trades on the NASDAQ stock exchange under the ticker symbol "VERU."

18. Defendant Mitchell Steiner, M.D. ("Steiner") has served as the Chairman, President, and Chief Executive Officer ("CEO") of Veru since 2016. Prior to the 2016 merger of FHC and APP, Steiner served as the CEO and President of APP from July 2014 through October 2016.

19. Defendant Michele Greco ("Greco") (together with Steiner, the "Individual Defendants") has served as Veru's Chief Financial Officer ("CFO") since March 2018 and as its Chief Administrative Officer since December 2017. Defendant Greco served as Veru's Executive Vice President of Finance from October 2016 to March 2018. Prior to the 2016 merger of FHC and APP, Defendant Greco served as Executive Vice President and Chief Financial Officer of FHC from December 2014 to October 2016 and as its Vice President and CFO from January 2013 to December 2014.

20. Each of the Individual Defendants directly participated in the management of Veru; was directly involved in the day-to-day operations of Veru at the highest levels; was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein; was aware of or deliberately or recklessly disregarded

that the false and misleading statements alleged herein were being issued concerning Veru; and/or approved or ratified these statements in violation of the federal securities laws.

21. Because of the Individual Defendants' positions within Veru, they had access to undisclosed information about sabizabulin, as well as Veru's business and present and future business prospects via access to internal corporate documents (including Veru's operating plans, budgets and forecasts and reports of actual operations and performance), conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

22. As officers of a publicly held company whose securities were, and are, registered with the SEC pursuant to the federal securities laws of the United States, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to Veru's drug candidates, including progress and issues concerning the development of these drug candidates, and Veru's present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Veru's publicly traded securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23. The Individual Defendants, because of their positions with Veru, possessed the power and authority to control the contents of Veru's reports to the SEC, press releases, and statements to the market. Each Individual Defendant was provided with copies of Veru's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their

positions and access to material non-public information, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are also liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

24. Each of the Individual Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Veru common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public concerning the likelihood the FDA would grant EUA status to sabizabulin (and the risks attendant thereto), and thus Veru's business and intrinsic value of its common stock and (ii) caused Plaintiffs and other shareholders to purchase Veru's common stock at artificially inflated prices.

### III. Relevant Non-Party

25. K. Gary Barnette, Ph.D. ("Barnette") has served as Veru's Chief Scientific Officer ("CSO") since September 2018. Prior to joining Veru, Dr. Barnette held leadership roles at Camargo Pharmaceutical Services, LLC and GTx, Inc. Dr. Barnette served as an FDA Clinical Pharmacology and Biopharmaceutics Reviewer from 1995 to 1998.

## STATEMENT OF FACTS

### I. Veru Is Born Out of a 2016 Merger Intended to Pivot from Profitable but Low-Growth Sexual Health Products, to Pre-Revenue, but High-Growth Pharmaceutical Products

26. Veru's predecessor-in-interest, The Female Health Company ("FHC"), manufactured and sold a single-product: an internal condom (also called a "female condom") intended to prevent both pregnancy and sexually transmitted infections. At all relevant times,

FHC's condom product was called the "FC2" as it was a second-generation product. Since approximately 2009, when FC2 received FDA approval, FC2 has accounted for nearly all of the Company's revenue.

27. On October 31, 2016, the Company underwent a critical transition when FHC completed the acquisition of APP, a privately held research and development company co-founded in 2014 by Defendant Steiner, for approximately $41.1 million in stock (the "APP Merger"). Defendant Steiner had served as CEO and President of APP until the APP Merger, and then became CEO of the surviving combined entity. The majority of Veru's Board of Directors after the APP Merger had previously been affiliated with APP, including Steiner. Immediately following the APP Merger, Defendant Steiner owned 14.5% of the Company.

28. At the time of the APP Merger, APP had a pipeline of five pharmaceutical therapies in development for oncological and urological conditions, almost all in early phases, and no products had been brought to market. Because APP was not generating revenue at the time of the APP Merger, FC2 would be the only meaningful revenue-generating asset and the primary source of revenue in the combined company as it pursued development of APP's pipeline assets.

29. At all relevant times, Defendants' strategy for the APP Merger has been to direct cash flows from FC2 to fund research and development of APP's drug pipeline. In connection with the APP Merger, Defendant Steiner recognized a "unique opportunity with access to capital to build a major player in men's and women's health and oncology," observing that "[t]he merger strategically joins a market-leading consumer health product that has been solidly profitable since 2006 with multiple high profile drug product candidates." Under the header "Strategy," the Company's 10-K for fiscal 2016 summarized the arrangement succinctly: "Our goal is to be a leader in men's and women's health and oncology by developing a portfolio of pharmaceutical

products that address significant health needs in large potential markets. We have combined the revenue and cash flows from the market leading FC2 female condom with APP's deep pipeline of pharmaceutical and consumer health product candidates."

30. On July 31, 2017, the Company changed its corporate name from "The Female Health Company" to "Veru Inc.," reflecting its new focus on developing and commercializing biopharmaceutical products.

## II. Following the APP Merger, Veru's R&D Pipeline Included the Drug Candidate Sabizabulin, Internally Named "Veru-111," in Development as a Treatment for Prostate Cancer

31. Following the APP Merger, Veru had five drug candidates in its R&D pipeline, all in development for the treatment of breast cancer, prostate cancer, and/or urological conditions. All five candidates were still in clinical development and the Company had not yet submitted NDAs with the FDA for any. **Table 1** below summarizes the uses of Veru's five drugs and their stage of clinical development at the time of the APP Merger:

**Table 1:**

| | |
|---|---|
| Veru-111 (formerly APP-111) | An oral anti-tubulin targeting chemotherapy agent. At the time of the APP Merger, APP was conducting the pre-clinical studies required before initial trials in patients could begin. |
| Veru-112 (formerly APP-112) | Drug with similar chemical composition to Veru-111, which the Company considered a "backup candidate" to be developed should Veru-111 fail. |
| APP-944 | An oral drug being developed for the treatment of hot flashes in men caused by prostate cancer hormone therapies. No clinical studies had been conducted at time of APP Merger. |
| Veru-722 (formerly MSS-722) | Being developed as the first FDA-approved oral agent for the treatment of idiopathic, or unexplained, male infertility. In a Phase II clinical trial at the time of the APP Merger |
| Tamsulosin Delayed Release Sachet ("DRS") | A granule formulation of the Tamsulosin HCI alpha blocker—the active ingredient in Flomax, a drug that was already FDA-approved—aimed to treat benign prostatic hyperplasia ("BPH") in males with difficulty swallowing Flomax capsules or tablets. The FDA agreed to an expedited regulatory pathway during the pendency of the APP Merger transaction in 2016. |

32. Thus, because of the APP Merger, Veru had many pipeline products simultaneously navigating expensive, lengthy trials in pursuit of FDA approval. Importantly, this pipeline included Veru-111.

33. Prior to the COVID pandemic, the Company had been developing Veru-111, also known by its chemical name "sabizabulin," for the treatment of castration-resistant prostate cancer. Sabizabulin is a microtubule inhibitor that binds with high affinity at the "colchicine binding site." During mitosis, the process of cell division, microtubules (tubular structures in the cell skeleton) join together, or "polymerize," to form a "mitotic spindle," which is responsible for segregating duplicated chromosomes between daughter cells. Microtubules are thus an essential component of cell division. Inhibiting microtubule activity, inversely, results in cell-cycle arrest. Tubulin-binding compounds that inhibit microtubule action have been effective in the treatment of a number of cancers due to their ability to induce cell cycle arrest in cancer cells. With this understanding, Veru was developing Sabizabulin as a treatment for prostate cancer on the theory that the drug would inhibit the proliferation of prostate cancer cells and block the transport of the androgen receptors necessary for tumor growth.

## III. Veru Experiences a Short-Lived Earnings Boost from COVID-Related Telemedicine Which Results in Higher FC2 Sales That Were Unsustainable and Sharply Declined During the Class Period

34. Historically, FC2 faced significant competition from external condoms, which are less expensive and much more popular with consumers. Accordingly, the Company's ability to monetize FC2 to pay for development of its drug candidates like Veru-111 was highly dependent on organizations and companies that distribute FC2 at no cost to consumers.

35. FC2 received approval from the World Health Organization ("WHO") in 2006, which allowed the Company to contract with United Nations agencies and public health organizations that purchased the product in bulk and distributed it for free around the world to aid

in the prevention of STIs like AIDS and unwanted pregnancy. However, as the WHO and other international regulators approved competitor products, Veru's Global Public Health Sector sales deteriorated. In the United States, by contrast, FC2 remained the only FDA-approved internal condom.

36. Seeing significant revenue and profit declines in the Global Public Health Sector, the Company shifted its focus to the United States. The new strategy aimed to capitalize on the Patient Protection and Affordable Care Act of 2010, and the regulations promulgated thereunder, which require insurance companies to guarantee coverage of eighteen "female-controlled" contraceptive methods—including internal condoms—with zero out-of-pocket cost to the insured. Thus, on March 9, 2017, during the first conference call held with investors following the APP Merger, Defendants announced that Veru was making FC2 available in the United States by prescription only. Prescription-based distribution would, unlike over-the-counter selling, allow end users' costs to be covered by insurance, and therefore, could manufacture demand despite low organic popularity.

37. Revenues from Veru's U.S. FC2 prescriptions quickly gained traction and, by 2020, had solidly overtaken the Company's Global Public Health Sector revenues to become Veru's most dominant revenue source, as depicted in **Figure 1**, below:

**Figure 1:**




38. The success of the U.S. prescription channel resulted mainly from arrangements with "telemedicine" or "telehealth" providers, i.e., phone or internet prescriber and pharmacy services. On a conference call discussing 2020 results, Defendant Steiner touted the Company's revenue growth, crediting "decreased [] reliance on the global public sector, which was volatile and inconsistent" and a shift to "partner[ships] with multiple telemedicine and Internet pharmacy partners."

39. Specifically, Veru depended heavily on a small number of telemedicine providers that specialized in women's health and contraceptive care and offered FC2 as a "free" add-on to hormonal birth control orders. At least as early as 2020, the Company's largest customers were telemedicine providers in the U.S. prescription channel. Indeed, Veru's largest customer, an internet prescriber called The Pill Club, accounted for 44% of Veru's net revenue in fiscal 2022 and 43% in fiscal 2021.

40. Unsurprisingly, the COVID-19 pandemic and associated shelter-in-place orders, which caused a 766% increase in telemedicine encounters in the first three months alone,[1] proved a boon for the Company's cash flows. However, telemedicine popularity waned as pandemic conditions subsided. By the first quarter of 2022, demand for telehealth services was 37% lower than its 2020 peak, with the majority of visits concentrated in the behavioral health sector.[2]

41. At the same time as pandemic-driven telemedicine was abating, regulators began scrutinizing the methods through which FC2 was dispensed by telehealth providers—namely, offering large quantities of FC2 as a "free" add-on at checkout, or even dispensing it without customer request at all, and then charging insurance companies significant sums. On April 11, 2022, for example, the State of California intervened in a *qui tam* action against The Pill Club, alleging in large part that The Pill Club had violated California law by billing California public insurance programs for FC2 prescribed in excess of medical necessity.[3]

42. Thus, after a short-lived surge caused by the COVID pandemic, the Company's FC2 revenue sharply declined, which posed serious risk to the Company's ability to pursue development of its pipeline drugs including late-stage clinical trials. Indeed, Veru's revenue sharply declined in 2021 and 2022, at the same time that research and development expenses exploded as evident in **Figure 2**:

---

[1] *See* Shaver, Julia. "The State of Telehealth Before and After the COVID-19 Pandemic." Primary Care Vol. 49,4 (2022): 517-530. doi:10.1016/j.pop.2022.04.002.

[2] "2022 Trends Shaping the US Economy," Trilliant Health (October 19, 2022).

[3] *The State of California, ex rel. Happy Baumann and Cindy Swintelski vs. The Pill Club Medical Group, Inc., et al.*, Case No. 34-2019-00253324. California ultimately reached a $15 million settlement with The Pill Club on February 7, 2023. *See*: https://oag.ca.gov/system/files/attachments/press-docs/TPC%20Fully%20Executed%20Settlement%20Agreement%20%281%29.pdf (last visited September 15, 2023).

**Figure 2:**




43. Veru's cash and cash equivalents likewise fell precipitously, as revenue failed to keep pace with rising expenses and the Company burned through cash reserves. This decline is depicted in **Figure 3** below:

**Figure 3:**



## IV. Prior to and Throughout the Class Period, Veru's R&D Costs Skyrocket

44. In addition to declining revenue, Veru simultaneously saw ballooning R&D costs. For example, on May 12, 2021, CFO Greco informed investors that Veru incurred R&D expenses of $7.5 million for the first quarter, compared to $3.9 million in the same quarter the year prior. R&D expenses would continue to balloon, doubling year-over-year from $7.5 million in the quarter ending March 31, 2021 to $15.5 million in the quarter ended March 31, 2022.

45. Rising R&D costs resulted primarily from costs associated with late-stage clinical trials. During the Class Period, Veru conducted multiple, expensive clinical trials, many of them simultaneously, including: the Phase III Trial; phase two and three studies in VERU-100 for the treatment of advanced prostate cancer; a phase two study of zuclomiphine citrate for the treatment of hot flashes in men; a phase three trial in Enbosarm for the treatment of metastatic breast cancer; a phase three trial of Enbosarm + abemaciclib for the treatment of metastatic breast cancer; a phase IIb clinical study of sabizabulin for the treatment of metastatic breast cancer; and a phase three clinical study of sabizabulin for the treatment of prostate cancer. Each of these trials was costly without guaranteed upside.

46. The steep, upward trajectory of R&D expenses through mid-2022 is depicted in **Figure 4**, below:

**Figure 4:**




47. As a result of simultaneous rises in R&D costs and declines in net revenue, Veru saw significant declines in net income, as depicted in **Figure 5**:

**Figure 5:**




**V. To Reverse Veru's Disastrous Profitability Resulting from Lower FC2 Revenue and Higher R&D Costs, Defendants Opportunistically Develop Sabizabulin for the Treatment of COVID-19 in Pursuit of an Emergency Use Authorization from the FDA, a Potential Source of Astronomic Revenue**

48. With unsustainable FC2 growth prospects and multiple drug candidates requiring lengthy and expensive R&D, Veru needed a stable and sizeable revenue stream to remain afloat. Thus, Defendants pivoted their attention to commercializing Veru-111 for treatment of COVID symptoms. In particular, Defendants postulated sabizabulin could have benefits for the treatment of COVID-related Severe Acute Respiratory Distress ("SARDS" or "ARDS"). Moreover, the pandemic offered the unique opportunity to obtain an EUA, which could short-circuit certain regulatory requirements and provide a shorter runway to generating desperately needed cash.

### A. Defendants Identify a Possible Application of Veru-111 for COVID-Induced ARDS

49. Based on Veru's research into Veru-111 with respect to cancer, Defendants hypothesized sabizabulin might have anti-inflammatory or antiviral properties that could aid in the treatment of viruses like COVID-19, though they could not identify the precise mechanisms for either of these functions. In particular, Defendants highlighted the potential of sabizabulin to treat "cytokine storm," which occurs when the body's anti-inflammatory systems overreact, sending excess cytokines into the bloodstream and causing the potential for ARDS, a leading cause of death in COVID-19 patients. Because the drug would interfere with cellular activity rather than with the virus itself, Defendants purported that the treatment would function against all virus variants.

50. With respect to inflammatory responses, Defendants posited that sabizabulin would operate using downstream anti-inflammatory action similar to another drug, Colchicine, which was FDA-approved for treating gout. Defendants based their hypothesis on sabizabulin's anti-inflammatory properties which Defendants postulated relate to the drug's inhibition of the formation of intact microtubule structures. Specifically, Defendants theorized that when a virus triggers an innate immune response, microtubules are critical in bringing together the components of the inflammasome—the immune system receptors that induce inflammation—which, in turn causes cytokine storm. Sabizabulin's function in inhibiting microtubules, therefore, could theoretically help prevent cytokine storm and ARDS.

51. Colchicine, notably, did not perform well against COVID-19. But because Colchicine and sabizabulin are different molecules with different pharmacology and sabizabulin is a more potent inhibitor, Defendants told investors that Colchicine's failure was not dispositive.

52. With respect to virological response, Defendants did not have evidence of sabizabulin's direct impact on viral activity. Instead, Defendants postulated that sabizabulin may

interfere with viral replication by inhibiting cellular functions. Specifically, viruses replicate and are packaged in the cell's endoplasmic reticulum ("ER"). Microtubules are essential for transporting the virus to and from the ER. The virus latches onto microtubules to move within the cell to the ER where it replicates and is packaged, passes through the golgi apparatus, and then is passed to microtubules which transport it to other cells in the body. Thus, according to Defendants, by inhibiting microtubule action, sabizabulin could hypothetically prevent the replication and spread of a virus within a body's system.

53. Postulating that either or both of the anti-inflammatory and anti-viral mechanisms could be effective in treating COVID-19-induced ARDS and therefore prevent death in the most critically ill COVID-patients, Defendants elected to redirect significant effort and resources to "opportunistically" develop sabizabulin for COVID-19.

### B. The Federal Government's Urgency, Desire, and Willingness to Issue EUAs in Response to the Pandemic Creates an Opportunity to Develop and Sell Sabizabulin on an Expedited and Less Expensive Basis

54. Defendants' decision to pivot toward a COVID-related application for Veru-111 was driven, crucially, by the U.S. government's desperation to quickly find successful treatments for COVID-19 and resulting willingness to issue Emergency Use Authorizations for COVID treatments during the pandemic.

55. On January 30, 2020, former U.S. Health and Human Services ("HHS") Secretary Alex Azar declared a public health emergency under section 319 of the Public Health Service Act, finding that COVID-19 had the significant potential to affect national security or the health and security of U.S. citizens. As of September 6, 2023, over 770 million confirmed cases and close to 7 million deaths have been reported worldwide. In the United States, over 103 million confirmed cases of COVID-19 and over 1.1 million deaths have been reported in that same time frame.

56. In response to the quickly spreading pandemic, the US government took several steps to facilitate the rapid development and deployment of COVID-19 medical countermeasures. First, HHS Secretary Azar granted the FDA the authority to begin issuing emergency use authorizations to permit the use of certain medications to diagnose, treat, or prevent COVID-19. An EUA, which has fewer efficacy and safety requirements than a traditional NDA, allows for faster regulatory approval.

57. Under the normal NDA process, drug companies seeking to sell a drug in the United States must first conduct rigorous studies to test the efficacy and safety of the drug and submit the data from those studies to an independent team of scientists for review. Pursuant to the "effectiveness requirement" of the 1962 Kefauver-Harris Amendment to the Food, Drug, and Cosmetic Act, an NDA cannot be granted unless the applicant demonstrates "***substantial evidence*** that the drug will have the effect it purports or is represented to have under proposed labeled conditions of use."[4] The term "substantial evidence" is statutorily defined as evidence "consisting of adequate and well-controlled investigation***s*** **[plural]**, including clinical investigation***s***, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, **on the basis of which it could fairly and responsibly *be concluded* by such experts that the drug *will have* the effect it purports or is represented to have** under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof."

58. Moreover, pursuant to federal regulation,[5] NDA applications, must comport with specific and nuanced requirements and must include effectiveness data "demonstrating ***substantial evidence of effectiveness for the claimed indications***," that is "presented by gender, age, and racial

---

[4] 21 U.S. Code § 355(d).
[5] 21 C.F.R. 314.50.

subgroups" and identifies "any modifications of dose or dose interval needed for specific subgroups;" and, "when appropriate," "[e]ffectiveness data from other subgroups of the population of patients treated…such as patients with renal failure or patients with different levels of severity of the disease, also must be presented."

59. The NDA process can take years from the time a drug is first identified as having potential therapeutic benefit to the time the drug is approved. The data from these preclinical tests, often known as Phase 1 studies, are then submitted to the FDA for review and approval to test the drug candidate in humans. Once human testing is approved, a drug company can engage in early-stage clinical testing, known as a Phase 2 trial, to determine the minimal safe and efficacious dosing level. Only after dosing safety and efficacy is determined can a drug company pursue a larger and more rigorous "Phase 3" study, also known as a "registrational" or "pivotal" study, whose results can be submitted to the FDA for approval to distribute and market the drug in the United States. FDA review of Phase 3 data typically then takes another 6-10 months from submission to approval.

60. The EUA, by contrast, allows unapproved drugs to be used in an emergency to treat or prevent serious or life-threatening disease when certain criteria are met. The FDA may only grant an EUA when a determination of threat has been made by the Secretary of Homeland Security, Defense, or, as in the case of COVID-19, HHS. Drugs may be considered for an EUA when there is demonstrable evidence that they "***may*** be effective" at treating or preventing the serious or life-threatening disease they target—a lower evidentiary burden than the "effectiveness" standard the FDA requires for approval of an NDA. Indeed, the FDA's "Emergency Use Authorization of Medical Products and Related Authorities: Guidance for Industry and Other Stakeholders," released in January 2017, specifies that "[t]he 'may be effective' standard for EUAs

provides for a lower level of evidence than the 'effectiveness' standard that FDA uses for product approvals."[6] Accordingly, "[i]f, ***based on the totality of the scientific evidence <u>available</u>***, it is ***reasonable to believe*** that the product ***may be effective*** for the specified use, FDA may authorize its emergency use[.]"[7]

61. In evaluating whether to grant an EUA to a particular drug candidate, the FDA considers the totality of the available scientific evidence and must find that the known and potential benefits of a drug outweigh the known and potential risks. Furthermore, the FDA evaluates the drug against current treatments that are considered the "standard of care" to determine whether the drug would fill an unmet need.

62. Over the course of the pandemic, the FDA issued multiple EUAs, creating the standard of care against which new EUA applications would be evaluated. Specifically, the FDA granted EUAs for remdesivir (May 1, 2020), baricitinib (November 19, 2020), and dexamethasone (August 4, 2021, but already being used off-label), amongst others. Moreover, in December 2020, the FDA granted EUAs for the Pfizer-BioNTech and Moderna COVID vaccines.

63. Thus, to take advantage of lower regulatory costs and burdens afforded by an EUA, as well as the shorter runway to highly profitable distribution, many pharmaceutical companies—including Veru—raced to secure a lucrative EUA for the next big treatment that could aid those with COVID-19.

## VI. Prior to the Class Period, Veru Conducts a Phase II Trial for Sabizabulin

64. On May 13, 2020, Defendants announced that Veru had received permission from

---

[6] Office of the Commissioner, Office of the Chief Scientist, Office of Counterterrorism and Emerging Threats, *Emergency Use Authorization of Medical Products and Related Authorities: Guidance for Industry and Other Stakeholders* (January 2017).
[7] *Id.*

the FDA to initiate a Phase 2 trial to study the efficacy and safety of sabizabulin for the treatment of COVID-19. Specifically, Veru intended to investigate the use of sabizabulin to treat hospitalized adults with moderate to severe COVID-19 who are at high risk for ARDS.

65. Veru designed the Phase 2 COVID-19 trial (the "901 Trial") as a 1:1 randomized, double-blind, parallel-group, placebo-controlled study. The study evaluated the impact of 18 milligrams of sabizabulin (either in an oral capsule or via nasogastric tube) in the cohort who were administered treatment taken daily for up to 21 days with a safety follow-up prior to day 60. The treatment group results were compared with data observed by the cohort who were administered placebo. The primary study endpoint was "60-day all-cause mortality," i.e., whether the patient survived to day 60. In total, the 901 Trial involved 39 subjects in total (19 patients in treatment and 20 patients in the control group).[8]

66. On June 19, 2020, Veru announced that the first patient had been enrolled in the 901 Trial. The primary endpoint was met on December 18, 2020 when all 39 patients completed day 60 of the trial, and results were announced on February 8, 2021. According to Veru, the 901 Trial showed a statistically significant 82% reduction in mortality versus placebo with no treatment-related adverse events.

## VII. Strapped for Cash, Defendants Design and Execute an Undersized and Unreliable Phase III Trial, Despite Numerous Warnings from the FDA that the Trial Size Was Too Small and That a Two-to-One Randomization Ratio Was Insufficient

### A. Over the FDA's Objections, Defendants Repeatedly Reduce Phase III Trial Size to Conserve Cash

67. On February 8, 2021, Defendants announced that the Company was granted an

[8] A "primary study endpoint" is an efficacy measure that addresses a study's main research question. Here, the 901 Trial's main research question was the correlation between sabizabulin treatment and survival through 60 days.

expedited meeting with the FDA to discuss a Phase 3 trial design for sabizabulin and anticipated first dosing in April 2021. In an investor call that same day, Defendant Steiner stated he anticipated, subject to FDA approval, that the Phase III Trial would enroll up to 200 hospitalized patients and would be a 1:1 randomized, double-blind study. Under this 1:1 design, up to 100 patients would receive sabizabulin and 100 patients would receive the placebo.

68. On March 1, 2021, Defendants announced that the FDA had agreed that Veru should proceed with a phase III registrational trial. Defendant Steiner emphasized that Veru was working collaboratively with the FDA, and that, according to Defendants, the target enrollment agreed to by the FDA was now 400 hospitalized patients—double what Steiner had represented just a few weeks earlier—with a 2:1 drug to placebo ratio, such that approximately 267 patients would receive sabizabulin and approximately 133 patients would receive the placebo.

69. On May 12, 2021, Defendants provided yet another update on the Phase III Trial design, stating that the FDA had now agreed to a target enrollment of just 300 patients—a 25% reduction from the initial purported agreement—and that enrollment was set to begin a week later. Under this updated design, just 200 patients would receive sabizabulin and 100 patients would receive the placebo.

70. On March 22, 2022, facing rapidly depleting cash assets, Defendants reduced the total trial population downward again, by nearly 33%, from 300 to 210. The new design retained the two-to-one treatment-to-placebo ratio, such that 140 participants would now receive the treatment and 70 would receive placebo. Defendants communicated this change to the FDA one week later on March 29, 2022, citing slow enrollment as its impetus.

71. As discussed above (supra ¶¶40-43), Veru's ability to execute expensive clinical trials (let alone for five pipeline drugs) was already hampered by shrinking revenue streams caused

by fewer FC2 prescriptions as pandemic-fueled telemedicine became less popular. Thus, according to Dr. Barnette, Defendants' reduction of the Phase III Trial population to 210 participants was a "business decision" made "as an organization," because the Company felt it had to "make [a] decision earlier" about the drug and therefore needed the study to conclude quickly.

72. In addition to reducing the absolute number of participants, the March 22, 2022 trial design change also significantly increased the likelihood that the Phase III Trial could be terminated early. The trial utilized an O'Brien-Fleming group sequential design ("OBF"), which allows for interim analyses and for early termination for "clear evidence of benefit" if prespecified results are observed. OBF statistical "p-value" thresholds for early termination move as trials progress.[9] At early stages—when the sample size of participants who have completed the trial is proportionally smaller compared with total planned enrollment—the criteria for termination are more stringent, requiring smaller p-values. Conversely, as the proportion of participants who have completed a trial relative to the total planned enrollment increases, the criteria for stopping an OBF trial become more lenient and allow for higher p-values.

73. The Phase III Trial design permitted one interim analysis, scheduled to occur when 150 participants reached Day 60 of the study. Under the pre-amendment Phase III Trial design, interim analysis would have been conducted using data from 150 out of 300 participants (50%) and required a p-value not to exceed .003, meaning less than a 3 in 1,000 chance that a mortality benefit at day 60—the primary endpoint of the study—was random. The reduction of the Phase III Trial population to 210 patients meant that the interim analysis would be conducted on 150 out of 210 participants (72%) and caused the p-value criterion to increase to .016, or a 1 in 160 chance

[9] In statistics, "p-value" refers to the probability of the observed result occurring in the absence of the test variable.

that the mortality benefit was random. The likelihood of early termination for clear evidence of benefit was therefore exponentially increased when the trial size was reduced.

74. By April 8, 2022, 150 of the Phase III Trial's participants had reached Day 60, triggering the pre-planned interim analysis by an independent data monitoring committee ("IDMC"). Assessing the primary endpoint of the study, mortality at day 60, the IDMC found that sabizabulin and standard-of-care treatment demonstrated a statistically significant 24.9% absolute reduction and a 55.2% relative reduction in patient deaths by day 60 compared with standard-of-care treatment alone, with a p-value equaling 0.0042—falling below the .016 threshold dictated by the OBF design for an interim assessment of 72% of the total target population. Accordingly, the IDMC recommended that the study be terminated.

75. Critically, had Defendants not reduced the study size on March 22, 2022, the IDMC would have required a p-value below .003 to recommend early termination. The actual p-value of .0042 at the interim would have failed to meet this threshold, and the study would have continued. Nevertheless, on the basis of the interim results, Defendants elected to terminate the trial.

76. As of April 8, 2022, Veru had already enrolled 204 patients in the Phase III Trial. Defendants allowed all enrolled individuals to complete the study but did not enroll the remaining 6 patients necessary to reach 210. Consequently, Veru's Phase III Trial was the smallest pivotal trial ever submitted to the FDA for consideration of an EUA related to a therapy for COVID. Indeed, as shown by **Figure 6**, with only 204 patients, the Phase III Trial was about half the size of the smallest trial that resulted in an EUA. Indeed, even if Veru had maintained a target enrollment of 300, the trial would still have been smaller than that of any approved EUA.

**Figure 6:**




### B. As a Result of Defendants' Trial Size Reductions, The Phase III Trial's Results Were Anomalous and Unreliable

77. The small sample size in the Phase III Trial caused significant concern that results could not be accurately extrapolated to the overall population. In considering drug applications, whether through the standard NDA process or the accelerated EUA process, the FDA considers both the drug's efficacy and its safety profile as a part of a risk-benefit analysis. Here, the small sample size hindered analysis of both.

78. At the threshold, the data set was simply too limited to enable adequate characterization of the drug's safety profile. The Phase III Trial monitored 130 patients, in total, in the treatment group. Of these, 82% stopped treatment before the prescribed 21 days, leading to a mean exposure duration of approximately 9.1 days. Accordingly, it was impossible to use the data to predict rare adverse events. In addition, the small size complicated assessment of the likelihood and potential implications of common, clinically relevant adverse events observed in

the data set—including UTIs, GI hemorrhages, anemia, and deep vein thrombosis—which can have serious repercussions in critically ill populations generally and in critical COVID-19 patients.

79. Moreover, the treatment and placebo groups in the Phase III Trial had certain baseline imbalances with clinical relevance. The limited sample size exacerbated the impact of these baseline imbalances between the study arms, thereby calling into question the veracity of the drug's observed efficacy. **Table 2** demonstrates that the Phase III Trial suffered imbalances with respect to each of the key criteria enumerated below that were likely to impact COVID-19 prognosis and mortality:

**Table 2**

| **Criteria** | **Treatment Arm** | **Placebo Arm** |
|---|---|---|
| **Subjects Aged ≥ 65** | 50% | 58.6% |
| **Subjects in ICU at Baseline** | 38.1% | 44.3% |
| **≥14 days of Standard of Care Prior to Randomization** | 6.7% | 0% |
| *Standard of Care Received* | | |
| **Remdesivir** | 29.9% | 24.3% |
| **Dexamethasone** | 80.6% | 77.1% |
| *Comorbidities* | | |
| **Diabetes** | 33.6% | 40% |
| **Hypertension** | 63.4% | 65.7% |
| **Pneumonia** | 60.4% | 65.7% |
| **Acute Respiratory Failure** | 20.9% | 25.7% |
| **Acute Respiratory Distress Syndrome** | 2.2% | 4.3% |
| **Subjects with No Comorbidities** | 16.4% | 12.9% |

80. As the FDA would later observe, the above imbalances at baseline were significant. Guidelines from the Center for Disease Control ("CDC"), for example, identify age as the single strongest risk factor for severe COVID-19 outcomes. Thus, the higher proportion of subjects over aged 65 in the placebo group could have meaningfully impacted results. Similarly, imbalances in standard of care prior to treatment were also likely impactful. All patients meeting criteria for the

trial would necessarily have had compelling indications for remdesivir and dexamethasone under U.S. standard of care, but the percentage of patients receiving these treatments was lower in the placebo group than the treatment group. Moreover, the FDA would observe that one of the most useful indicators of baseline severity is number of patients in ICU at baseline; the data set indicated more than a 6% disparity between the groups on this metric. Further, the above-enumerated co-morbidities are likewise each significant mortality risk factors in COVID-19.[10]

81. Because of the small sample size and 2:1 randomization, imbalances affecting even very small numbers of patients could fundamentally impact the conclusions drawn from the data, and any controls built into the efficacy model may not have fully accounted for the imbalances. As the FDA's Dr. Karimi-Shah would later explain, in a hypothetical scenario in which the death outcomes for even four patients in the treatment arm were changed from alive to not alive, the statistical significance of the results at the 0.05 confidence interval would be eliminated. Moreover, as the FDA would explain when it declined the application, even assuming the baseline imbalances were an innocent externality of the limited sample, the cumulative clinical impact of the imbalances in this small a study could nevertheless be impactful.

82. The data ultimately collected in the Phase III Trial reinforces the inference that the imbalances between the treatment and control arms likely *did* impact the results. The mortality rate observed at Day 60 in the placebo group was exceptionally high: 45.1% at the interim analysis and 39.7% in the total 204 sample. These numbers far exceeded mortality rates observed in similar populations in prior and concurrent studies. By way of comparison, the FDA cited five prior and concurrent studies with placebo mortality rates of 15%, 25%, 11%, 16.5%, and 35%,

[10] Djaharuddin, Irawaty et al. "Comorbidities and mortality in COVID-19 patients." Gaceta sanitaria vol. 35 Suppl 2 (2021): S530-S532. doi:10.1016/j.gaceta.2021.10.085.

respectively—all well below the rates in the Phase III Trial. Accordingly, the limited trial size caused the imbalances between the trial arms to cast doubt on the accuracy of the study's efficacy and safety data.

### VIII. Prior To, and Throughout the Class Period, Defendants Concealed from Investors That the FDA Repeatedly Requested a Larger Trial and a One-To-One Study Design in Order to Grant an EUA

83. Defendants admittedly knew the FDA's position regarding the design of the Phase III Trial. Indeed, they touted as much, including in their February 8, 2021 statement that they met with the FDA to discuss the Phase III Trial design and their statements on March 1, 2021 that Veru had reached an "agreement" that included a 400-person total enrollment. Similarly, on April 11, 2022, Defendants held a special call with analysts where Defendant Steiner admitted that Defendants had been in "***constant dialogue***" with the FDA throughout the Phase III Trial.

84. Despite this "constant dialogue," Defendants concealed from investors that the FDA expressly and repeatedly cautioned Defendants against the small size of the trial and had requested a total enrollment of ***at least 500*** in the treatment arm (meaning, a total trial enrollment of at least 750 participants in a 2:1 study, and a total trial enrollment of at least 1,000 participants in a 1:1 study).

85. On September 7, 2022, the Company announced that the FDA had requested the Company present before the Pulmonary-Allergy Drugs Advisory Committee ("PADAC") concerning the costs and benefits of Veru-111. Defendants presented to the PADAC on November 9, 2022 in proceedings that were recorded on YouTube. A transcript of the proceedings was also contemporaneously released to the public.

86. During the PADAC Meeting, FDA representatives revealed for the first time that the FDA had repeatedly and consistently warned Defendants throughout the Phase III Trial that the tested population should be larger, and specifically, the FDA requested that Veru enroll more

than 500 participants in the treatment group, alone. For example, during the PADAC Meeting, Robert Busch, M.D., MMSc, an FDA Medical Officer discussed the FDA's communications with Defendants concerning the Phase III Trial (i.e., "Study 902"), stating, in pertinent part:

> In terms of COVID-19, the sponsor initially conducted a 1 to 1 randomized, double-blind, placebo-controlled, proof-of-concept trial among 39 subjects hospitalized with COVID-19, meeting enrollment criteria. The results of that trial led to the design and conduct of Study 902, an efficacy and safety trial that was initially planned to enroll 300 subjects based on enrollment criteria we'll discuss further.
>
> It's worth noting that ***communications between the division and the sponsor highlighted repeatedly that the size of the safety database was small compared to other products which had been granted EUA, and that the division proposed that at least 500 subjects treated with Veru-111 would provide a more robust characterization of both effectiveness and safety in the context of a possible clinical benefit and any potential safety concern observed.***
>
> However, during the conduct of Study 902, the sponsor proposed a sample size change from 300 down to 210 subjects, as they've noted, citing slow enrollment. This was followed by an interim analysis that suggested efficacy on the all-cause mortality endpoint, based on an analysis of the first 150 subjects.

87. Further, when pressed by one of the PADAC Voting Members as to the nature of communications between the FDA and Veru "when this study was started[,]" Dr. Busch confirmed that the FDA had instructed Defendants, and Defendants knew ***at all relevant times*** that the FDA preferred a trial population in excess of 500 patients. Moreover, Dr. Busch revealed that the FDA had warned Veru against using a "2 to 1 randomization ratio" (two patients in the trial arm to every one patient in the placebo arm), stating in pertinent part:

> *Susanne May, M.D.*
> So maybe it's not only discussion, but if there is another question to the FDA here, it is***, when this study was started, some of the concerns that are still raised now could have been anticipated before it was started***, and what would the agency have wanted to see differently for this study to not bring this to the advisory committee but be convinced and go ahead with the emergency use authorization? And that's my comment and question.
>
> *Robert Busch, M.D., MMSc*

> So we did mention -- find my slide – during the presentation that ***communications between the division and the sponsor highlighted repeatedly that the size of the safety database was small compared to other products which had been granted the EUA, and that the division proposed that at least 500 subjects treated with Veru-111 would provide a more robust characterization of both effectiveness and safety***.
>
> I think that during the pandemic, there are certain things that we have power to regulate and certain things that we do not. If a sponsor proposes a study where the sample size is not ideal for our purposes, that may not be a reason to stop the trial. ***We can give advice, but we can't force that issue***. I think that we had an expectation that there might be another trial.
>
> ***In addition, I think it's important to note that we also cautioned against the 2 to 1 randomization ratio. Again, we may have expected a bigger study to begin with, and we didn't necessarily expect the sample size to go down further.***
>
> In all this context, again, we are somewhat limited in the power of what we can do, and we didn't want to shut down research during the pandemic if it seemed notable. We have to acknowledge, though, too, the reason this is at an advisory committee with so few subjects is because of the point estimate. I don't think there was a way for us to predict -- again, as the sponsor presenter said, "I've never seen a risk difference --" again, we keep coming back to that. We might have expected that we would have another trial.
>
> We might have expected that we would have more people in the trial along the way before the sample size changed. ***But we did make clear to the sponsor, a few times, we would expect 500 subjects.*** So that's a reasonable discussion of where our expectations stood in the context of a pandemic.

88. Randomizing the two arms of the Phase III Trial using a two-to-one formula seriously impaired the study's reliability. As Dr. Busch explained during the PADAC Meeting, "any effect on the mortality of even a few subjects in the placebo group may have exaggerated effect on the overall results."

89. At the conclusion of the PADAC Meeting, eight of the thirteen Voting Members voted "No" to the question, "Do the known and potential benefits of Veru-111, when used for the treatment of adult patients hospitalized with COVID-19 at high risk of ARDS, outweigh the known and potential risks of Veru-111?" Importantly, every single Voting Member who voted "No"

remarked that the sample size of the Phase III Trial was too small and/or that they would have required a larger trial. For example, Dr. Pamela Shaw stated, "***I really think I do need to see an additional trial to get that number exposed to the 500 or so; that is what the FDA was generally comfortable with***." Likewise, before voting "No" due to the "potential imbalance factors between the groups in the setting of a small size, where only a small number of outcomes would need to be changed to influence results[,]" Dr. Scott Evans stated "I think it's informative that ***the FDA had previously recommended 500 or more patients at least to start off with***."

90. Notably, none of the Veru representatives that attended the PADAC meeting, which included Defendant Steiner and Dr. Barnett, disputed any of the factual assertions or conclusions made during the PADAC meeting that are set forth in Paragraphs 79-83III, above. Moreover, Defendants have never disputed such statements to date.

91. On this news, the Company's common stock price cratered, falling $8.04 per share, almost ***54%***, from $15.01 per share at market close on November 9, 2022 to $6.97 per share at market close on November 10, 2022, on exceptionally heavy trading volume of more than 36 million shares.

92. On February 24, 2023, the FDA officially declined to grant Veru an EUA for sabizabulin. The FDA's report to Veru declining the EUA titled "Declination of Emergency Use Authorization for sabizabulin 9 mg Capsules[,]" (the "Declination Report"), explained, in pertinent part, that the FDA explicitly advised Veru to **<u>not</u>** reduce the Phase III Trial population from 300 to 210. Throughout the Class Period, Defendants concealed this fact. Indeed, according to the declination report:

> To support the sample size reduction to 210 subjects (140 subjects in the Veru-111 treated group and 70 subjects in the placebo treated group), the Sponsor cited calculations based on assumptions from the Phase 2 study.…**The Agency continued to caution against this change, noting that there was considerable**

> **uncertainty in the Phase 2 study results relied upon for these calculations. The Agency also raised concerns regarding whether the resulting limited safety database would be sufficient to characterize the known and potential risks associated with Veru-111. However, the Sponsor moved forward with this reduction**.

93. Defendants publicly announced the declination on March 2, 2023 in a press release. On this news, Veru's stock price fell $1.36 per share, approximately ***40%***, from $3.78 per share at market close on March 2, 2023 to $2.42 per share at market close on March 3, 2023, on heavy trading volume of more than 16 million shares.

## DEFENDANTS' MATERIAL CLASS PERIOD MISREPRESENTATIONS AND OMISSIONS

94. Throughout the Class Period the FDA repeatedly warned Defendants that Veru's Phase III Trial was improperly designed and executed because the sample size was far too small to produce reliable data and the 2:1 randomization ratio increased the likelihood of imbalances between the treatment and placebo groups, including with respect to material characteristics such as clinical severity, that could skew the Phase III Trial's results. . In order to conceal these warnings from investors throughout the Class Period, Defendants issued a series of material misstatements and omitted material facts in the Company's public filings, press releases and other documents. These material misstatements and omissions created the false impression that the FDA had approved the design of the Phase III Trial, including its size and randomization ratio, and had directly communicated to the Company that Veru's application for an EUA would very likely be successful.

95. Plaintiffs assert that all statements made by Defendants set forth below that are bolded and underlined were false and misleading when made for the reasons set forth therein. Non-bolded statements are included for context.

**I. March 1, 2021 Press Release**

96. The Class Period begins on March 1, 2021, when, before market open, Defendants issued press release misleadingly titled "**Veru Received FDA Agreement to Advance VERU-111 into Phase 3 Study** in Hospitalized COVID-19 Patients at High Risk for Acute Respiratory Distress Syndrome (ARDS)" (the "March 1, 2021 Press Release"). In the March 1, 2021 Press Release, Defendants announced that the Company met with the FDA regarding the Phase III Trial and misrepresented that the FDA had "agreed" to Veru's trial design, stating in relevant part:

> Veru Inc. … today announced that **the FDA agreed in an End of Phase 2 meeting, to advance VERU-111 into a Phase 3 registrational clinical study** based on clinically meaningful benefits observed with VERU-111 treatment in the recently completed double-blind, randomized, placebo-controlled Phase 2 clinical trial evaluating oral, once-a-day dosing of VERU-111 versus placebo in approximately 40 hospitalized COVID-19 patients at high risk of ARDS ….
>
> "We are very pleased with the outcome of the FDA meeting. **FDA was extremely collaborative** and thought that the clinical data from the Phase 2 were promising **and suggest a potential clinically meaningful benefit for the use of VERU-111 warrants further development in a Phase 3 program**," said Mitchell Steiner, M.D., Chairman, President and Chief Executive Officer of Veru ….
>
> With a similar trial design to the completed positive Phase 2 study, the Phase 3 clinical registration trial design will evaluate daily oral doses of VERU-111 versus placebo with the primary efficacy endpoint of proportion of patients alive at Day 29. **It is expected that the Phase 3 clinical trial will be conducted in approximately 400 hospitalized who have SARS-CoV-2 virus infection and are at high risk for ARDS at a 2:1 ratio between the VERU-111 (approximately 267 patients) and placebo (approximately 133 patients) treated groups.**

97. The foregoing statements in the March 1, 2021 Press Release were materially false and/or misleading or omitted material information necessary to make them not misleading because, they created the false impression that Veru obtained FDA approval of the Phase III Trial design (including the trial size and randomization scheme) while concealing known risks articulated by the FDA, and thereby misrepresented the likelihood of success for Veru's EUA application. The material falsity of Defendants' foregoing statements in the March 1, 2021 Press Release is

supported by ample evidence, including that: (i) the FDA "highlighted repeatedly" to Defendants that the Phase III Trial population should be larger, with "at least 500 subjects treated with Veru-111" to provide sufficient size for the FDA to assess both the efficacy and safety of the drug; and (ii) the FDA had cautioned Defendants that the Phase III Trial should not use a 2:1 randomization ratio because "of the small sample size", noting that "any effect on the mortality of even a few subjects in the placebo group may have exaggerated effect on the overall results" and conclusions that the FDA could (and did) make concerning efficacy.

**II. May 12, 2021 Earnings Call**

98. On May 12, 2021, before market open, Defendants held an earnings call with research analysts to discuss results for the second quarter of fiscal year 2021 (the "May 12, 2021 Earnings Call"). During the May 12, 2021 Earnings Call Defendant Steiner once again falsely stated that the FDA had approved of the Phase III Trial's design, stating in relevant part:

> The company was granted an expedited end of Phase 2 meeting with FDA to discuss the next steps, including the Phase 3 clinical registration trial design for sabizabulin COVID-19 program. **The FDA agreed upon sabizabulin for the COVID-19 Phase 3 trial as a double-blind, multi-center, multinational randomized 2:1 placebo-controlled trial, evaluating daily oral doses of 9-milligrams of sabizabulin for up to 21 days versus placebo in 300 hospitalized COVID-19 patients, who had high risk for ARDS**. There will be 200 subjects who will be treated with sabizabulin and 100 subjects who will receive placebo.

99. These foregoing statements in the May 12, 2021 Earnings Call were materially false and/or misleading or omitted material information necessary to make them not misleading because they created the false impression that Veru obtained FDA approval of the Phase III Trial design (including the trial size and randomization scheme), while concealing that the FDA had expressly warned about specific risks relating to the trial's size and randomization ratio, and thereby misrepresented the likelihood of success for Veru's EUA application. The material falsity of Defendants' foregoing statements in the May 12, 2021 Earnings Call is supported by ample

evidence, including that: (i) the FDA "highlighted repeatedly" to Defendants that the Phase III Trial population should be larger, with "at least 500 subjects treated with Veru-111" to provide sufficient size for the FDA to assess both the efficacy and safety of the drug; and (ii) the FDA had cautioned Defendants that the Phase III Trial should not use a 2:1 randomization ratio because "of the small sample size," noting that "any effect on the mortality of even a few subjects in the placebo group may have exaggerated effect on the overall results" and conclusions that the FDA could (and did) draw concerning efficacy.

**III. May 11, 2022 Press Release**

100. On May 11, 2022, before market open, Defendants issued a press release discussing the outcome of their May 10, 2022 meeting with the FDA (the "May 11, 2022 Press Release"). The May 11, 2022 Press Release was falsely and misleadingly entitled "**FDA States that Veru Should Submit Request for Emergency Use Authorization (EUA) Based on Positive Efficacy and Safety Data from the Phase 3 Clinical Study of Sabizabulin in Hospitalized COVID-19 Patients**[.]"

101. Further, the May 11, 2022 Press release falsely and/or misleadingly announced that the FDA "**agreed**" that the Phase III Trial was sufficient to support both the efficacy and safety requirements of an EUA request, that the efficacy data was also sufficient to support an NDA request, and that "**No Additional Efficacy Studies or Safety Data are Required to Support a Request for EUA**." The press release stated, in fuller part:

> **FDA has agreed that the efficacy and safety data from the completed Phase 3 clinical study in hospitalized COVID-19 patients at high risk for acute respiratory distress syndrome are sufficient to support the submission of a request for Emergency Use Authorization (EUA).**

* * *

> **FDA agreed that the Phase 3 COVID-19 study that was stopped by the Independent Data Monitoring Committee for overwhelming efficacy is sufficient to support the efficacy portion of a request for EUA submission and for an NDA submission.**
>
> **FDA agreed that the current safety data available for sabizabulin is sufficient to support the safety portion of a request for EUA submission. FDA informed the Company that additional safety data that would be collected during the use of sabizabulin under the EUA, if granted, will be sufficient to support an NDA submission, and furthermore, that no additional safety clinical studies are required.**

102. In addition, the May 11, 2022 Press Release quoted Defendant Steiner, who falsely and/or misleadingly stated, in pertinent part:

> **The discussion with FDA in the Pre-EUA meeting has established a direct path forward to expedite the availability of sabizabulin to the high risk hospitalized patients with COVID-19.** … In the Phase 3 COVID-19 clinical study, sabizabulin demonstrated a clear mortality benefit in hospitalized moderate to severe COVID-19 patients on current standard of care with no significant safety signals.

103. These foregoing statements in ¶¶100-02 in the May 11, 2022 Press Release were materially false and/or misleading or omitted material information necessary to make them not misleading because they created the false impression that Veru obtained FDA approval of the Phase III Trial design (including the trial size and randomization scheme), while concealing that the FDA had expressly warned about specific risks relating to the trial's size and randomization ratio, and thereby misrepresented the likelihood of success for Veru's EUA application. The material falsity of Defendants' foregoing statements in the May 11, 2022 Press Release is supported by ample evidence, including that: (i) the FDA "highlighted repeatedly" to Defendants that the Phase III Trial population should be larger, with "at least 500 subjects treated with Veru-111" to provide sufficient size for the FDA to assess both the efficacy and safety of the drug; (ii) the FDA had cautioned Defendants that the Phase III Trial should not use a 2:1 randomization ratio because "of the small sample size," noting that "any effect on the mortality of even a few subjects

in the placebo group may have exaggerated effect on the overall results" and conclusions that the FDA could (and did) draw concerning efficacy; and (iii) the FDA had directly warned Defendants that reducing the Phase III Trial size from 300 to 210, which was the direct cause of the Phase III Trial's early termination, would jeopardize the FDA's ability to assess "the known and potential risks associated with Veru-111. However, the Sponsor [Veru] moved forward with this reduction" in disregard of the FDA's warnings.

**IV. May 12, 2022 Press Release**

104. On May 12, 2022, before market open, Defendants issued a press release announcing results for the second quarter of fiscal year 2022 titled "Veru Reports Second Quarter Fiscal 2022 Results and Progress of Sabizabulin for COVID-19 Toward a Request for Emergency Use Authorization" (the "May 12, 2022 Press Release").

105. The May 12, 2022 Press release touted that the FDA had "**agreed**" that the Phase III Trial was "**sufficient to support the efficacy portion of a request for EUA submission and for an NDA submission.**" The press release continued:

> **FDA also agreed that the current safety data available for sabizabulin is sufficient to support the safety portion of a request for EUA submission. FDA informed the Company that additional safety data that would be collected during the use of sabizabulin under the EUA, if granted, will be sufficient to support an NDA submission, and furthermore, that no additional safety clinical studies are required.**

106. In the same press release, Defendant Steiner is quoted repeating much of the above:

> "Following a positive Phase 3 COVID-19 clinical study where sabizabulin treatment resulted in a clear clinical benefit by significantly reducing deaths, we met with FDA for a Pre-EUA meeting on May 10, 2022. **FDA agreed that our development program had sufficient efficacy and safety data to support a request for EUA application. No additional efficacy or safety studies will be required**," said Mitchell Steiner, M.D., Chairman, President and Chief Executive Officer of Veru Inc. "The Agency has been incredibly responsive, and we look forward to submitting a request for Emergency Use Authorization application as soon as possible. The high mortality rates observed in hospitalized moderate to

> severe COVID-19 patients in the placebo group underscores that this remains a high unmet medical need. We look forward to updating you as we advance sabizabulin to these high-risk patients."

107. The foregoing statements in ¶¶105-06 in the May 12, 2022 Press Release were materially false and/or misleading or omitted material information necessary to make them not misleading because they created the false impression that Veru obtained FDA approval of the Phase III Trial design (including the trial size and randomization scheme), while concealing that the FDA had expressly warned about specific risks relating to the trial's size and randomization ratio, and thereby misrepresented the likelihood of success for Veru's EUA application. The material falsity of Defendants' foregoing statements in the May 12, 2022 Press Release is supported by ample evidence, including that: (i) the FDA "highlighted repeatedly" to Defendants that the Phase III Trial population should be larger, with "at least 500 subjects treated with Veru-111" to provide sufficient size for the FDA to assess both the efficacy and safety of the drug; (ii) the FDA had cautioned Defendants that the Phase III Trial should not use a 2:1 randomization ratio because "of the small sample size", noting that "any effect on the mortality of even a few subjects in the placebo group may have exaggerated effect on the overall results" and conclusions that the FDA could (and did) draw concerning efficacy; and (iii) the FDA had directly warned Defendants that reducing the Phase III Trial size from 300 to 210, which was the direct cause of the Phase III Trial's early termination, would jeopardize the FDA's ability to assess "the known and potential risks associated with Veru-111. However, the Sponsor [Veru] moved forward with this reduction" in disregard of the FDA's warnings.

**V. May 12, 2022 Form 10-Q**

108. On May 12, 2022, before market open, Veru filed a Quarterly Report with the SEC on Form 10-Q for the second quarter of fiscal year 2022 (the "May 12, 2022 Form 10-Q"), signed

by Defendants Steiner and Greco. Additionally, Defendants Steiner and Greco signed certifications of having reviewed the May 12, 2022 Form 10-Q, as required by the Sarbanes-Oxley Act of 2002.

109. In the May 12, 2022 Form 10-Q, Defendants falsely represented that the FDA "agreed" that the Phase III Trial's design and execution provided the necessary safety and efficacy detail to support, not just an EUA, but also an NDA. Specifically, Defendants falsely stated, in pertinent part:

> On May 10, 2022, the Company had a pre-Emergency Use Authorization (EUA) meeting with the FDA to discuss next steps including the submission of an EUA application regarding sabizabulin for COVID-19. The outcome of this meeting was: **(i) the FDA agreed that no additional efficacy studies were required to support an EUA application or a new drug application (NDA); and (ii) the FDA agreed that no additional safety data was required to support an EUA application and that collection of safety data under the EUA will satisfy the safety requirement for an NDA. The FDA agreed that the request for the EUA is supported by efficacy and safety from our positive Phase 3 COVID-19 study in hospitalized moderate to severe COVID-19 patients who are at high risk for ARDS and death and no additional clinical trials are required to support an NDA submission**. We plan to submit the EUA application in the second quarter of calendar year 2022.

110. The May 12, 2022 Form 10-Q also contained risk factors which were themselves misleading, as they suggested that the FDA merely "may" request additional trial data, even though Defendants *knew* that the FDA had requested a trial size of at least 500 patients in the treatment arm (and therefore, at least 1,000 patients in the total Phase III Trial population, assuming a 1:1 randomization ratio). Specifically, Defendants falsely and misleadingly stated, in pertinent part: "Although the EUA process is designed to enable more expeditious marketing of a drug in response to a public health emergency, **FDA review of an EUA application may take longer than expected and may result in the FDA requesting additional data or other information that may have the effect of delaying the EUA** . . . ."

111. The foregoing statements in ¶¶109-10 were materially false and/or misleading or omitted material information necessary to make them not misleading because they created the false impression that Veru obtained FDA approval of the Phase III Trial design (including the trial size and randomization scheme), while concealing that the FDA had expressly warned about specific risks relating to the trial's size and randomization ratio, and thereby misrepresented the likelihood of success for Veru's EUA application. The material falsity of Defendants' foregoing statements in the May 12, 2022 Form 10-Q is supported by ample evidence, including that: (i) the FDA "highlighted repeatedly" to Defendants that the Phase III Trial population should be larger, with "at least 500 subjects treated with Veru-111," to provide sufficient size for the FDA to assess both the efficacy and safety of the drug; (ii) the FDA had cautioned Defendants that the Phase III Trial should not use a 2:1 randomization ratio because "of the small sample size," noting that "any effect on the mortality of even a few subjects in the placebo group may have exaggerated effect on the overall results" and conclusions that the FDA could (and did) draw concerning efficacy; and (iii) the FDA had directly warned Defendants that reducing the Phase III Trial size from 300 to 210, which was the direct cause of the Phase III Trial's early termination, would jeopardize the FDA's ability to assess "the known and potential risks associated with Veru-111. However, the Sponsor [Veru] moved forward with this reduction" in disregard of the FDA's warnings.

## VI. May 12, 2022 Earnings Call

112. On May 12, 2022, before market open, Defendants held an earnings call with research analysts to discuss results for the second quarter of fiscal year 2022 and address criticisms of the Phase III Trial leveled by short sellers (the "May 12, 2022 Earnings Call"). During the May 12, 2022 Earnings Call, Defendant Steiner once again falsely stated that the FDA had approved of the Phase III Trial's design, stating in relevant part:

> We had a pre-emergency use authorization meeting with FDA on May 10 to discuss the next steps, including the submission of an emergency use authorization application. The outcome of this meeting is as follows. **FDA agrees that no additional efficacy studies are required to support an EUA or a full NDA. FDA agreed that no additional safety data required to support an EUA and collection of safety data under the EUA will satisfy the safety requirement for a full NDA. Therefore, FDA agreed that the request for EUA is supported by efficacy and safety data from our positive Phase III COVID-19 study in hospitalized moderate to severe COVID-19 patients who are at high risk for ARDS and no additional clinical studies are required to support an NDA submission.**
>
> ***
>
> I would like to directly respond to several criticisms that have been made about the Phase III COVID-19 clinical trial....
>
> **Concern #4, there is a high risk that the FDA will not accept an EUA application because our Phase III study was too small. Not true.** As we have previously reported, we've had a pre-EUA meeting with FDA on May 10, 2022.
>
> **FDA agreed that no additional efficacy studies are required to support an EUA or an NDA. FDA agreed that no additional safety data required to support an EUA and the collection of safety data under the EUA will satisfy the safety requirement for an NDA. Therefore, FDA agreed that the request for EUA is supported by efficacy and safety data from our positive Phase III COVID-19 study in hospitalized moderate to severe COVID-19 patients who are at high risk for ARDS and no additional clinical trials are required to support an NDA submission.** Short sellers might like to lob unfounded criticisms, **but our audience is the FDA who helped develop the study design and who have now told us that the data are sufficient to proceed.** As patients are waiting, we will work diligently to prepare and to submit the EUA application **now that we've received the green light and encouragement to do so from FDA.**

113. The foregoing statements in ¶112 were materially false and/or misleading or omitted material information necessary to make them not misleading because they created the false impression that Veru obtained FDA approval of the Phase III Trial design (including the trial size and randomization scheme), while concealing that the FDA had expressly warned about specific risks relating to the trial's size and randomization ratio, and thereby misrepresented the likelihood of success for Veru's EUA application. The material falsity of Defendants' foregoing statements

in the May 12, 2022 Earnings Call is supported by ample evidence, including that: (i) the FDA "highlighted repeatedly" to Defendants that the Phase III Trial population should be larger, with "at least 500 subjects treated with Veru-111" to provide sufficient size for the FDA to assess both the efficacy and safety of the drug; (ii) the FDA had cautioned Defendants that the Phase III Trial should not use a 2:1 randomization ratio because "of the small sample size", noting that "any effect on the mortality of even a few subjects in the placebo group may have exaggerated effect on the overall results" and conclusions that the FDA could (and did) draw concerning efficacy; and (iii) the FDA had directly warned Defendants that reducing the Phase III Trial size from 300 to 210, which was the direct cause of the Phase III Trial's early termination, would jeopardize the FDA's ability to assess "the known and potential risks associated with Veru-111. However, the Sponsor [Veru] moved forward with this reduction" in disregard of the FDA's warnings.

## VII. August 11, 2022 Form 10-Q

114. On August 11, 2022, before market open, Veru filed a Quarterly Report with the SEC on Form 10-Q for the third quarter of fiscal year 2022 (the "August 11, 2022 Form 10-Q"), signed by Defendants Steiner and Greco. Additionally, Defendants Steiner and Greco signed certifications attesting to having reviewed the August 11, 2022 Form 10-Q, as required by the Sarbanes-Oxley Act of 2002.

115. In the August 11, 2022 Form 10-Q, Defendants falsely and misleadingly represented that the FDA "agreed" that the Phase III Trial's design and execution provided necessary safety and efficacy detail to support, not just an EUA, but also an NDA. Specifically, Defendants falsely stated, in pertinent part:

> On May 10, 2022, the Company had a pre-Emergency Use Authorization (EUA) meeting with the FDA to discuss next steps including the submission of an EUA application regarding sabizabulin for COVID-19. The outcome of this meeting was: **(i) the FDA agreed that no additional efficacy studies were required to support**

> **an EUA application or a new drug application (NDA); and (ii) the FDA agreed that no additional safety data was required to support an EUA application and that collection of safety data under the EUA will satisfy the safety requirement for an NDA. The FDA agreed that the request for the EUA is supported by efficacy and safety from our positive Phase 3 COVID-19 study in hospitalized moderate to severe COVID-19 patients who are at high risk for ARDS and death and no additional clinical trials are required to support an NDA submission**.

116. The August 11, 2022 Form 10-Q also contained risk factors which were themselves misleading as they merely suggested that the FDA "may" request additional trial data, even though Defendants *knew* that the FDA requested a trial size of at least 500 patients in the treatment arm (and therefore, at least 1,000 patients in the total Phase III Trial population assuming a 1:1 randomization ratio). Specifically, Defendants falsely and misleadingly stated, in pertinent part: "Although the EUA process is designed to enable more expeditious marketing of a drug in response to a public health emergency, **FDA review of an EUA application may take longer than expected and may result in the FDA requesting additional data or other information that may have the effect of delaying the EUA** . . . ."

117. The foregoing statements in ¶¶115-16 were materially false and/or misleading or omitted material information necessary to make them not misleading because they created the false impression that Veru obtained FDA approval of the Phase III Trial design (including the trial size and randomization scheme), while concealing that the FDA had expressly warned about specific risks relating to the trial's size and randomization ratio, thereby materially understating the FDA's desire for "additional data or other information" and misrepresenting the likelihood of success for Veru's EUA application. The material falsity of Defendants' foregoing statements in the August 11, 2022 Press Release is supported by ample evidence, including that: (i) the FDA "highlighted repeatedly" to Defendants that the Phase III Trial population should be larger, with "at least 500 subjects treated with Veru-111" to provide sufficient size for the FDA to assess both the efficacy

and safety of the drug; (ii) the FDA had cautioned Defendants that the Phase III Trial should not use a 2:1 randomization ratio because "of the small sample size", noting that "any effect on the mortality of even a few subjects in the placebo group may have exaggerated effect on the overall results" and conclusions that the FDA could (and did) make concerning efficacy; and (iii) the FDA had directly warned Defendants that reducing the Phase III Trial size from 300 to 210, which was the direct cause of the Phase III Trial's early termination, would jeopardize the FDA's ability to assess whether "the known and potential risks associated with Veru-111. However, the Sponsor [Veru] moved forward with this reduction" in disregard of the FDA's warnings.

## THE TRUTH IS REVEALED IN TWO SETS OF PARTIALLY CORRECTIVE DISCLOSURES AND/OR MATERIALIZATIONS OF THE RISK

### I. The November 9, 2022 PADAC Meeting

118. On November 9, 2022, the truth concerning the infirmities in Veru's Phase III Trial design was first revealed when the FDA held the PADAC Meeting. The PADAC meeting was recorded on YouTube and a transcript of the proceedings was published on the FDA's website.

119. During the PADAC Meeting, FDA representatives revealed for the first time that the FDA had consistently informed Defendants throughout Relevant Time Period that the Phase III Trial population should be larger, and specifically, the FDA requested that Veru enroll "at least" 500 participants in the treatment population, alone. For example, the FDA Medical Officer Dr. Robert Busch, stated, in pertinent part that the FDA had "***highlighted repeatedly that the size of the safety database was small compared to other products which had been granted EUA,***" and further noted that the FDA "***proposed that at least 500 subjects treated with -111 would provide a more robust characterization of both effectiveness and safety in the context of a possible clinical benefit and any potential safety concern observed.***" As Dr. Busch plainly summarized, "we did make clear to the sponsor [Veru], a few times, we would expect 500 subjects."

120. Moreover, Dr. Busch revealed that the FDA had warned Defendants against using a "2 to 1 randomization ratio" (two patients in the trial arm to every one patient in the placebo arm), as an overly small placebo group could undermine the significance of the trial data. Dr. Busch told Voting members "***I think it's important to note that we also cautioned against the 2 to 1 randomization ratio. Again, we may have expected a bigger study to begin with, and we didn't necessarily expect the sample size to go down further.***"

121. At the conclusion of the PADAC Meeting, eight of the thirteen Voting Members voted "No" to the question, "Do the known and potential benefits of Veru-111, when used for the treatment of adult patients hospitalized with COVID-19 at high risk of ARDS, outweigh the known and potential risks of Veru-111?" Importantly, every single Voting Member who voted "No" remarked that the sample size of the Phase III Trial was too small and/or that they would have required a larger trial.

122. On this news, the Company's common stock price cratered, falling $8.04 per share, or almost ***54%***, from $15.01 per share at market close on November 9, 2022 to $6.97 per share at market close on November 10, 2022, on exceptionally heavy trading volume of more than 36 million shares.

## II. The March 2, 2023 Press Release

123. On March 2, 2023, after market close, Veru issued a press release announcing that the FDA had declined to grant an EUA for sabizabulin as a COVID treatment. The press release stated, in pertinent part:

> Veru Inc. (NASDAQ: Veru), a biopharmaceutical company focused on developing novel medicines for COVID-19 and other viral ARDS-related diseases and for oncology, today announced that the U.S. Food and Drug Administration (FDA) has declined to grant at this time the Company's request for Emergency Use Authorization (EUA) for sabizabulin, Veru's novel microtubule disruptor, to treat hospitalized adult patients with moderate to severe COVID-19 who are at high risk for Acute Respiratory Distress Syndrome (ARDS).

124. On this news, Veru's stock price fell $1.36 per share, or approximately ***40%***, from $3.78 per share at market close on March 2, 2023 to $2.42 per share at market close on March 3, 2023, on heavy trading volume of more than 16 million shares.

## ADDITIONAL SCIENTER ALLEGATIONS

125. As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and document issued and disseminated in their names and in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated in and/or acquiesced to the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

### I. The Individual Defendants Knowingly and/or Recklessly Made Material Misstatements and/or Omitted Material Facts.

#### A. The FDA "Repeatedly" Told Defendants That the Phase III Trial Was Too Small and Continually Raised Concerns About Study Design and Lack of Sufficient Safety Data

126. FDA representatives confirmed at the PADAC Meeting that prior to and throughout the Class Period, the FDA "highlighted repeatedly" to Defendants that the Phase III Trial's size was smaller than comparable trials where an EUA was granted, and also "repeatedly" informed Defendants that the Phase III Trial should have at least 500 subjects in the treatment arm to "provide a more robust characterization of both effectiveness and safety in the context of a possible clinical benefit and any potential safety concern observed." Indeed, in response to a question at the PADAC Meeting regarding what "the agency [would] have wanted to see differently for this study" from "before" the Phase III Trial "was started," Dr. Busch stated that the FDA had "highlighted repeatedly" to Defendants that the sample size was too small and had specifically

"cautioned [Defendants] against" the 2 to 1 randomization ratio. Defendants did not dispute the FDA's statements at the PADAC meeting.

127. Furthermore, in its report declining the EUA, the FDA confirmed that it had specifically told Defendants that Veru should not reduce the trial size from 300 persons to 210 persons—a decision that directly resulted in both a smaller population size and the early termination of the trial. Indeed, the FDA confirmed in its Declination Report that the "limited safety database" resulting from Defendants' trial size reduction jeopardized Veru's and the FDA's ability "to characterize the known and potential risks associated with Veru-111." The Declination Report further stated that "***However***," despite the FDA's warnings "***the Sponsor moved forward with this reduction***."

128. Defendants' knowing and/or reckless disregard of the FDA's warnings throughout the Class Period supports a strong inference that they made the false and misleading statements alleged herein with scienter.

### B. Defendants Admit to and Tout "Constant Dialogue" with the FDA Regarding the Phase III Trial Throughout the Class Period

129. By their own admission, Defendants were in "constant dialogue with the FDA" regarding the parameters of the Phase III Trial throughout the Class Period. For example, in a special call with investors on April 11, 2022 discussing Veru's decision to end the Phase III Trial early, Defendant Steiner responded to an analyst question concerning communication with the FDA and the projected timeline for an EUA by emphasizing that Defendants had been in "constant dialogue with the FDA," since January 2022 when the FDA granted the drug "Fast Track" designation, stating "***I will tell you, since we were fast tracked -- we have Fast Track designation, we have been in constant dialogue with FDA***."

130. Indeed, Defendants touted their communication with the FDA from the outset of the Phase III Trial, emphasizing that the Phase III Trial's design—including the decision to conduct the trial as a 2:1 placebo-controlled trial in 300 patients—was made in conjunction with the FDA. Thus, for example, in the May 12, 2021 Earnings Call, Defendant Steiner emphasized in his prepared remarks that:

> The company was granted an expedited end of Phase 2 meeting with FDA to discuss the next steps, including the Phase 3 clinical registration trial design for sabizabulin COVID-19 program. ***The FDA agreed upon sabizabulin for the COVID-19 Phase 3 trial as a double-blind, multi-center, multinational randomized 2:1 placebo-controlled trial, evaluating daily oral doses of 9-milligrams of sabizabulin for up to 21 days versus placebo in 300 hospitalized COVID-19 patients, who had high risk for ARDS***. There will be 200 subjects who will be treated with sabizabulin and 100 subjects who will receive placebo.

131. Defendants likewise expressly and unequivocally touted that they held a pre-emergency use authorization meeting with the FDA in May 2022, in which, as Defendant Steiner stated on the May 12, 2022 Earnings Call, "***FDA agreed that no additional safety data required to support an EUA and collection of safety data under the EUA will satisfy the safety requirement for a full NDA***." Defendant Steiner's description of the meeting is excerpted more fully below:

> We had a pre-emergency use authorization meeting with FDA on May 10 to discuss the next steps, including the submission of an emergency use authorization application. The outcome of this meeting is as follows. FDA agrees that no additional efficacy studies are required to support an EUA or a full NDA. FDA agreed that no additional safety data required to support an EUA and collection of safety data under the EUA will satisfy the safety requirement for a full NDA. Therefore, FDA agreed that the request for EUA is supported by efficacy and safety data from our positive Phase III COVID-19 study in hospitalized moderate to severe COVID-19 patients who are at high risk for ARDS and no additional clinical studies are required to support an NDA submission.

132. In the same call, Defendant Steiner responded to criticisms of the Phase III Trial. In his statement, Defendant Steiner reiterated that:

> As we have previously reported, we've had a pre-EUA meeting with FDA on May 10, 2022. FDA agreed that no additional efficacy studies are required to support an EUA or an NDA. FDA agreed that no additional safety data required to support an EUA and the collection of safety data under the EUA will satisfy the safety requirement for an NDA. Therefore, FDA agreed that the request for EUA is supported by efficacy and safety data from our positive Phase III COVID-19 study in hospitalized moderate to severe COVID-19 patients who are at high risk for ARDS and no additional clinical trials are required to support an NDA submission.

133. Moreover, Defendant Steiner specifically assured investors that the FDA had "helped develop" the study design, told the Company the data were "sufficient to proceed," and "encourage[d]" the Company to submit the EUA based on the limited data collected, stating: "Short sellers might like to lob unfounded criticisms, but ***our audience is the FDA who helped develop the study design and who have now told us that the data are sufficient to proceed.*** As patients are waiting, we will work diligently to prepare and to submit the EUA application now that ***we've received the green light and encouragement to do so from FDA***."

134. In the August 11, 2022 Earnings Call, Defendants admitted to further communication with the FDA following the EUA submission. In his prepared remarks, Defendant Steiner acknowledged: "[w]e know FDA is actively reviewing the application," because ***"[w]e have received and have responded to several requests for additional information to help their ongoing review.*** " Defendant Steiner further touted that "***FDA has informed us that our request for an EU application is a high priority***."

135. Thus, Defendants not only admitted to, but specifically bragged of ongoing communication with the FDA regarding sabizabulin's development for COVID-19 throughout the entirety of the Class Period.

### C. That Defendants Increased the Proposed Trial Size from 200 to 400 Following Their Initial Meeting with the FDA Evidences That Defendants Knew the FDA Wanted a Larger Trial and Believed That a Trial with 200 Participants Was Too Small to Obtain EUA Approval

136. On February 8, 2021, Defendants announced that Veru planned for a trial population of 200 individuals. Just ***three weeks later***, on March 1, 2021, Defendants falsely stated that after Veru met with the FDA, the Company had reached "agreement" with the FDA for a trial size of 400 individuals. Defendants' decision to double the trial size just three weeks after announcing the original design creates a strong inference that Defendants were aware of the FDA's expectation that the trial include at least 500 patients in the treatment arm and increased the trial size in response to the FDA's warnings described by Dr. Busch at the PADAC meeting.

137. Defendants' decision to increase the trial size *from* 200 participants—almost exactly the number they later reverted to—after meeting with the FDA supports a strong inference that Defendants knew or consciously disregarded that the FDA preferred a larger trial design to support issuance of an EUA.

### D. Defendants Admit They Made a "Business Decision" When Reducing the Phase III Trial Size

138. As Defendants' sales from FC2 waned, Defendants reduced the Phase III Trial's size to 300 patients, and then to 210 patients, in order to speed up the EUA application and approval process.

139. Dr. Barnette admitted at the PADAC meeting that Defendants' reduction of the Phase III Trial population was a "business decision" made because, "as an organization," the Company felt it had to "make [a] decision earlier" about the drug and therefore needed the study to conclude quickly.

140. Dr. Barnette's statement that Veru's decision to reduce the trial size was made for "business" reasons stands in stark contrast to Defendants' statements throughout the Class Period that the Phase III Trial's design (*i.e.*, the population size) was the result of FDA's "agreement" and Defendant Steiner's statements during the May 12, 2022 Earnings Call that the FDA "helped develop the study design[.]"

141. Similarly, Defendant Steiner acknowledged in the May 12, 2022 Earnings Call, amongst other instances, that development of sabizabulin was "opportunistic[]," stating that "[b]eing opportunistic and successful in developing sabizabulin COVID-19 has led to the most eventful and transformative quarter in Veru's history."

142. Dr. Barnette's statement and Dr. Steiner's statement support a strong inference that Defendants reduced the size of the Phase III Trial for "opportunistic," "business" reasons, while knowingly and/or recklessly concealing from investors that the FDA preferred a larger trial design to support issuance of an EUA.

**II. The Individual Defendants Were Motivated to Commit Fraud**

143. Throughout the Class Period, Veru was hampered by a rapidly deteriorating balance sheet, caused by dwindling revenues and rocketing expenses. Defendants were motivated to commit the fraud alleged herein as a desperate, reckless gamble in the hope of generating revenue to pay for the Company's enormously expensive R&D operations.

144. As described above, Veru's primary strategy for funding drug development was to direct cash flow from sales of FC2 toward research and development, and, indeed, throughout the Class Period, FC2 was essentially the Company's sole revenue driver. After hitting a pandemic-induced peak in the first half of 2021, however, FC2 revenues began a steady decline, as depicted in **Figure 7**:

**Figure 7:**




145. At the same time, R&D expenses were rapidly rising, primarily driven by costs related to the development of sabizabulin for COVID-19 and other late-stage clinical trials. Indeed, by the end of 2021, Veru's quarterly R&D expenses exceeded its quarterly revenue, even without accounting for other operating and non-operating expenses. This trend would only intensify in the ensuing quarters, as depicted below in **Figure 8**:

**Figure 8:**



146. Accordingly, Veru did not have the resources to perform a phase III registrational trial as large as the one requested by the FDA (i.e., at least five hundred patients in treatment), and Defendants desperately needed the FDA to grant an EUA for Veru-111 so that the Company would have a steady, sizeable revenue stream to cover rising costs. Defendants recklessly gambled that, despite "repeated" admonitions to the contrary, FDA would nonetheless look past the Phase III Trial's flawed design, accept the unreliable and anomalous results, grant an EUA, and that because of Defendants' repeated misrepresentations, investors would never learn of the fraud. Defendants' motive and opportunity to perpetrate such a scheme creates a strong inference of scienter.

## LOSS CAUSATION

147. During the Class Period, and as detailed herein, Defendants materially misled the investing public, thereby inflating the price of Veru's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make their own statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Veru's business, operations, and prospects as alleged herein.

148. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, the Defendants made or caused to be made a series of materially false and/or misleading statements about the prospects and success of the Phase III Trial and its impact on Veru's business. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.

149. The materially false and/or misleading statements made by the Defendants during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

150. The first partial corrective disclosure occurred on November 9, 2022 at the PADAC Meeting. During the PADAC Meeting, FDA representatives revealed, among other disclosures, that "before" the Phase III Trial was even started and throughout the Class Period, "communications between the [FDA] and [Veru] highlighted repeatedly that the size of the safety database was small compared to other products which had been granted the EUA, and that the [FDA] proposed that at least 500 subjects treated with Veru-111 would provide a more robust characterization of both effectiveness and safety." Further, it was disclosed for the first time at the PADAC Meeting that throughout the Class Period, the FDA had repeatedly "cautioned" Defendants "against the 2 to 1 randomization ratio." *See also* "THE TRUTH IS REVEALED;" "STATEMENT OF FACTS" § VIII, *supra* (reciting all partial corrective disclosures and materializations of the risk).

151. Additionally, at the November 9, 2022 PADAC Meeting, an almost supermajority of Voting Members voted that Veru-111's benefits as a treatment for COVID did not outweigh its risks. Accordingly, the vote was a partial materialization of the risk that Veru would not receive an EUA for sabizabulin. Indeed, every Voting Member who voted "No" at the PADAC Meeting remarked that the sample size of the Phase III Trial was too small and/or that they would have required a larger trial. Two such members specifically remarked that their votes were driven by the fact that Defendants ignored the FDA's undisclosed request for a trial size of at least 500 people. For example, Dr. Scott Evans stated: "it's informative that the FDA had previously recommended 500 or more patients at least ***to start off with***." Veru representatives, including

Defendant Steiner and Dr. Barnett, did not dispute this assertion by Dr. Evans or the earlier, comparable assertions by the FDA.

152. On this news, the Company's common stock price fell $8.04 per share, almost 54%, from $15.01 per share at market close on November 9, 2022 to $6.97 per share at market close on November 10, 2022, on exceptionally heavy trading volume of more than 36 million shares.

153. The partial corrective disclosures and materializations of the risk resulting from the November 9, 2022 PADAC Meeting roiled the market for Veru securities. Analysts recognized the import of the disclosures at the PADAC meeting and expressly and directly connected them with a decline in the value of VERU securities. For example, on November 9, 2022, Cantor Fitzgerald analysts issued a research report titled "Adcom Vote Disappointing, We Await FDA Decision and Color on Next Steps," in which the analysts noted that "***the stock has traded on the potential for the EUA in COVID, in our view, and we would expect meaningful weakness ahead of any clarity from the FDA and/or company on the path forward***." Reporting on the cause of such "weakness" resulting from disclosures at the PADAC Meeting, the Cantor Fitzgerald report stated, in pertinent part:

> ■ ***More patients exposed to Sabizabulin is definitely key***, especially within the U.S., as there was some concern as to how to interpret U.S. standard of care, given the small number of patients in the U.S. placebo arm.
>
> ■ ***Suggestions in terms of an additional trial, seemed to focus on getting to ~500 patients***, although some suggestion of even another very similar trial could suffice.

154. Other news organizations reported similarly. For example, Reuters published an article on November 9, 2022, written by Bhanvi Satija and Raghav Mahobe, titled "U.S. FDA panel votes against Veru's COVID-19 pill[.]" The articled noted, in relevant part:

> Veru's application for authorization was based on data from a late-stage study of 210 patients, ***although the regulator had warned that this was small compared to other authorized drugs and proposed a 500-patient sample size***.

> During the meeting, other issues with sabizabulin's data were also discussed, such as the lack of clarity over a relevant patient population and the high rate of deaths in a placebo group, which the reviewers had previously flagged.

155. On March 2, 2023, after market close, the risk that the Phase III Trial's undersized test population would jeopardize approval of an EUA for sabizabulin fully materialized when Veru disclosed that its application was denied. On this news, Veru's stock price fell $1.36 per share, approximately ***40%***, from $3.78 per share at market close on March 2, 2023 to $2.42 per share at market close on March 3, 2023, on heavy trading volume of more than 16 million shares.

156. Market participants reacted immediately to the March 2, 2023 press release, and directly linked it with declines in the price of VERU securities. For example, on March 3, 2023, Vandana Singh wrote a news article published by Benzinga, a popular financial news outlet, titled "Why Veru Stock Is Crashing Today?" Ms. Singh's article explained that "[t]he FDA declined to grant Veru Inc's (NASDAQ: Veru) request for Emergency Use Authorization (EUA) for sabizabulin to treat hospitalized adult patients with moderate to severe COVID-19 who are at high risk for Acute Respiratory Distress Syndrome (ARDS)."

157. As a result of their purchases of Veru securities during the Class Period at artificially inflated prices, Plaintiffs and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. The timing and magnitude of the price declines in Veru shares negate any inference that the losses suffered by Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## CLASS ACTION ALLEGATIONS

158. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired Veru

publicly traded securities between March 1, 2021 and March 2, 2023, inclusive, seeking to pursue remedies under the Exchange Act. Excluded from the Class are Veru and its subsidiaries and affiliates; their respective officers and directors at all relevant times; their immediate families, legal representatives, heirs, successors, and assigns; and all entities in which any Defendant has or had a controlling interest.

159. Because Veru securities were actively traded on the NASDAQ, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiffs believe that there are thousands of Class members. Members of the Class may be identified from records maintained by Veru or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

160. Plaintiffs' claims are typical of those of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein. Moreover, Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel who are competent and experienced in class action and securities litigation.

161. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

a. Whether Defendants violated the federal securities laws, as alleged herein;

b. Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about Veru's business and operations;

c. Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. Whether the Individual Defendants caused Veru to issue false and misleading SEC filings and public statements during the Class Period;

e. Whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f. Whether the prices of Veru securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g. Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

162. A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PRESUMPTION OF RELIANCE

163. Plaintiffs and the Class are presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for the Company's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

a. Veru's common stock was actively traded on the NASDAQ;

b. The market price of Veru common stock reacted promptly to the dissemination of public information regarding the Company;

c. The Company's stock was followed by financial analysts, including those cited in this Complaint;

d. The average weekly trading volume for Veru stock during the Class Period was approximately 27 million shares;

e. As a regulated issuer, Veru filed periodic public reports with the SEC during the Class Period;

f. Veru regularly communicated with public investors via established market communication mechanisms; and

g. During the Class Period, the Company had over 80 million shares outstanding and the Company's market capitalization was over $1.9 billion on August 17, 2022.

164. Throughout the Class Period, the Company was consistently followed by the market, including multiple securities analysts. The market relies upon the Company's financial results and management to accurately present the Company's financial results. During this period, Veru and the Individual Defendants continued to pump materially false and misleading information into the marketplace regarding the Company and likelihood that the FDA would grant EUA for sabizabulin as a treatment for COVID. This information was promptly reviewed and analyzed by analysts and investors and assimilated into the price of the Company's securities.

165. As a result of the misconduct alleged herein, including Defendants' false and misleading statements and omissions, the market for Veru securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

166. Plaintiffs and the Class justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their

purchases of Veru securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

167. Plaintiffs and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) because claims asserted herein against Defendants are predicated upon omissions of material fact which Defendants had a duty to disclose.

168. Had Plaintiffs and other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth behind Defendants' material misstatements, they would not have purchased Veru securities at artificially inflated prices.

## NO STATUTORY SAFE HARBOR

169. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

170. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

171. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false, forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or

misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Veru who knew that the statement was false when made.

## CLAIMS FOR RELIEF

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5

***Against All Defendants***

172. Plaintiffs reallege each allegation as if fully set forth herein.

173. This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants named herein.

174. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Veru securities; and (iii) cause Plaintiffs and the other members of the Class to purchase or otherwise acquire Veru securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

175. During the Class Period, Defendants, by the use of means and instrumentalities of interstate commerce: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements they issued not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiffs and the Class, all in an effort to maintain artificially high market prices for Veru securities in violation of Section 10(b) of the Exchange Act and Rule 10b-

5 promulgated thereunder. Defendants acted individually and in concert in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

176. During the Class Period, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company and in the names of the Individual Defendants were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced to the issuance or dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, Defendants participated in the fraudulent scheme alleged herein.

177. The Individual Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to the investing public, including Plaintiffs and the Class.

178. As a result of the foregoing, the market price of Veru securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements and business plans described above and/or the integrity of the market price of Veru securities during the Class Period in purchasing

Veru securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

179. Had Plaintiffs and the other members of the Class been aware that the market price of Veru securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company and the Individual Defendants did not disclose, they would not have purchased Veru securities at the artificially inflated prices that they did, or at all.

180. As a result of the wrongful conduct alleged herein, Plaintiffs and the other members of the Class have suffered damages in an amount to be established at trial. Plaintiffs' and the Class's losses were proximately caused by Defendants' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiffs and other members of the Class purchased Veru securities in reliance on the integrity of the market price of the securities, and Defendants manipulated the price of Veru securities through their misconduct, as described herein. Plaintiffs' and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of, among other things, the FDA's repeated warnings to Defendants that the Phase III Trial was too small and utilized a problematic randomization ratio, notwithstanding affirmative representations to the contrary.

181. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of Veru securities during the Class Period.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act**

***Against the Individual Defendants***

182. Plaintiffs reallege each allegation as if fully set forth herein.

183. This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants.

184. Veru and the Individual Defendants are liable as primary violators of Section 10(b) of the Exchange Act and Rule 10b-5 as set forth herein.

185. The Individual Defendants acted as controlling persons of Veru within the meaning of Section 20(a) of the Exchange Act. Because of their positions, the Individual Defendants had the power and authority to cause Veru to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

186. Specifically, the Individual Defendants, by reason of their status as senior executive officers and/or directors of Veru, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiffs and the Class, within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases and interviews with various news sources cited herein related to Plaintiffs' and the Class's investments in Veru securities within the meaning of Section 20(a) of the Exchange Act. Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

187. The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements, press releases and other public statements. Because of their

close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

188. The Individual Defendants knew or recklessly disregarded the fact that Veru's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

189. By virtue of their high-level positions and their participation in and awareness of Veru's operations and preparation and dissemination of its public statements, the Individual Defendants were able to and did influence and control the Company's decision-making, including controlling the content and dissemination of the documents that Plaintiffs and the Class contend contained materially false and misleading information and on which Plaintiffs and the Class relied.

190. As set forth herein, the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

191. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Veru securities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as Class Representatives;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D. Granting Plaintiffs leave to amend this complaint to conform to the evidence; and

E. Awarding such equitable/injunctive or other relief in Plaintiffs' favor as the Court may deem just and proper.

**JURY DEMAND**

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

Dated: September 15, 2023

Respectfully submitted,

By: *Cullin Avram O'Brien*
Cullin Avram O'Brien
**CULLIN O'BRIEN LAW, P.A.**
6541 NE 21st Way
Ft. Lauderdale, FL 33308
Tel: (561) 676-6370
Email: cullin@cullinobrienlaw.com

*Liaison Counsel for Plaintiffs and the Class*

Shannon L. Hopkins
Gregory M. Potrepka
Rachel A. Berger
**LEVI & KORSINSKY, LLP**
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (212) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: rberger@zlk.com

*Lead Counsel for Plaintiffs and the Class*

**CERTIFICATE OF SERVICE**

I HEREBY certify that on September 15, 2023, I electronically filed the foregoing document with the Clerk of the Court via CM/ECF.

*/s/ Cullin O'Brien*
Cullin O'Brien